IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID DELREAL,

    Petitioner,

v.

RANDY GROUNDS,

    Respondent.

No. C 13-03423 WHA

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## INTRODUCTION

In this habeas action filed by a state prisoner, the petition is **DENIED**.

## STATEMENT

Petitioner David DelReal is currently incarcerated at Salinas Valley State Prison in Monterey County. Pursuant to 28 U.S.C. 2254, he has filed a petition for writ of habeas corpus challenging a California state court conviction. Petitioner is represented by counsel.

On March 29, 2010, petitioner was charged by information in San Benito County Superior Court with one count of attempted first-degree murder (Cal. Pen. Code Sections 664/187(a)). The same day, he was charged by separate information with one count of carrying a concealed dirk or dagger (Cal. Pen. Code Section 12020(a)(4)). The attempted murder information was subsequently amended to allege sentencing enhancements of personal discharge of a firearm causing great bodily harm (Cal. Pen. Code Section 12022.53(d)), personal discharge of a firearm (Cal. Pen. Code Section 12022.53(c)), personal use of a firearm (Cal. Pen. Code Section 12022.53(b)), and personal infliction of great bodily harm (Cal. Pen. Code Section 12022.7). California Penal Code 12022.53 establishes sentencing enhancements for the use and discharge of firearms in the commission of specified offenses, including attempted murder, but

1  not the lesser-included offense of attempted voluntary manslaughter. The two actions were
2  ultimately consolidated for trial.

3  Before trial, petitioner moved to bifurcate the special allegations and have the special
4  allegations tried to the trial court. The motion was granted. On June 22, 2010, following a
5  three-day trial, a jury found petitioner not guilty of attempted murder, but guilty of the lesser
6  degree of attempted voluntary manslaughter (Cal. Pen. Code Sections 664/192) and of carrying a
7  concealed dirk or dagger.

8  At the bifurcated hearing on July 2, 2013, the prosecution asked for a sentencing
9  enhancement finding of personal use of a firearm (Cal. Pen. Code Section 12022.5). California
10 Penal Code Section 12022.5 establishes similar sentencing enhancements to Section 12022.53,
11 but applies to the use of firearms in the commission of *any* felony or attempted felony, including
12 voluntary manslaughter. Defense counsel argued at the hearing that the prosecutor had not pled
13 the Section 12022.5 sentencing enhancement in the amended information, so petitioner did not
14 waive his right to a jury trial on that alleged enhancement and the trial court should not make the
15 finding. The trial court overruled the objection and made "true" findings on the Section 12022.5
16 enhancement, along with the great bodily injury enhancement. On August 26, 2010, petitioner
17 was sentenced to 19 years and 2 months in prison (RT 269–73, 1253, 1503–06, 1513–14,
18 1760–61; CT 65–67, 74–78, 223–25, 231, 300, 304–05).*

19 The California Court of Appeal affirmed (Ans., Exh. 6). On April 25, 2012, the
20 California Supreme Court denied a petition for review (Ans., Exh. 8). Petitioner filed the instant
21 federal habeas petition on July 24, 2013, but the petition alleged several unexhausted claims. On
22 September 13, 2013, petitioner's motion to withdraw the unexhausted claims was granted (Dkt.
23 No. 4).

24 The following background facts are taken from the opinion of the California Court of
25 Appeal:

26
        A. The Prosecution's Case
27

28  * The great bodily harm enhancement was later stayed by the Court of Appeal (Petition at 13, n.2).
Thus, this order will not address that enhanced allegation.

2

### 1. José Avalos

On February 20, 2008, José Avalos and Richard Huerto had parked Richard's car by a friend's house when they observed nearby two people they recognized to be rival gang members. Richard called defendant and defendant's brother, Martin, for protection. When defendant and Martin arrived, José saw defendant reach his hand into his belt, pull out a gun, and point it toward the sky. José heard him announce: "This is what I got for them" or something like that. But by then the two rival gang members were no longer present. Defendant and Martin got into Richard's car and the group drove around for about an hour.

Eventually, the men stopped at José's house where they met up with some other men. They had "two thirty-packs of Budweiser" and drank with a "beer bong," which is a funnel that allows one to drink two or three beers at a time. Everybody got "messed up." José denied having drunk very much himself but he thought "everyone else" drank "probably like six beers they had within ten minutes." Martin started fighting with Richard and tried to break a lamp over his head. They were not fighting really hard but "just like that[,] [defendant] pulled out his gun, put it in the back of [Martin] and told him calm the F down."

José tried to throw the brothers out of the house and "[t]he next thing I know, [defendant] hits me once on the nose, I am checking for blood, I know he has a gun, so I tell him [g]ive the gun to [Richard]." When defendant shook his head "no" José said that he could not control himself and "went after him." José punched defendant in the face a few times. José stated that, probably because he (José) had the upper hand, defendant "stepped back like two steps and shot me in my stomach." Defendant was standing in front of José and José saw defendant pull out his gun and fire. José felt a burning and fell to the ground. Martin immediately started kicking and punching José. José's brother Fernando punched Martin off José and the brothers ran away.

Soon an ambulance and the police arrived. José told the police that "David" had shot him. While in the hospital recovering from the surgery to repair the gunshot wound, José identified defendant in a photo lineup. He identified Martin as the one who kicked him after he was shot.

When asked on cross examination what had started the fight, José said, "The beer, we drank it too fast, next thing you know everyone is fighting each other, you know. Martin is the one who initiated the fight against [Richard]. And then [defendant] pulled out the gun, put [it] in the back of his brother and said [c]alm down or I'm going to F-ing shoot you." Martin showed signs of being drunk in that he was "overaggressive." José threw Martin's shirt at him, called him a "tweaker" because he believed that he and defendant used methamphetamine, and told him to get out of the house. That was when defendant got mad and punched him in the nose and José lost control and started punching defendant. José was certain that it was defendant who shot him; "[w]ithout a shadow of a doubt in my mind, I am a hundred percent sure who shot me."

### 2. Captain Carlos Reynoso

3

1       Captain Carlos Reynoso interviewed José after his first surgery. Reynoso had supervised the crime scene and was aware that José's brother Fernando had identified Martin as the shooter. Indeed, by the time Reynoso interviewed José at the hospital, Martin was in custody. He had been found about 300 yards away from the crime scene, so drunk he could not stand up straight. He had vomited "all over himself, and was incoherent," "mumbling," "very intoxicated." Defendant had not been located.

When Reynoso met with José at the hospital, José could not speak but he appeared awake and alert and answered questions by nodding or shaking his head or giving a thumbs-up or thumbs-down sign. José wrote a note saying he wanted Martin arrested. He denied that Martin had shot him, stating that defendant had shot him but that Martin had kicked him after he was shot. He identified Martin from a photo lineup. He also identified defendant and wrote next to defendant's photo, "shoot me." José asked Reynoso if he wanted the whole story, and then wrote, "attempted murder" on the captain's clipboard. José wanted both men prosecuted for attempted murder.

About a month later, Reynoso interviewed José in the hospital after he had been re-admitted for complications from the previous surgery. He was "in pretty bad shape" but could speak. At that interview José said that he did not want to prosecute his assailants; he "was intoxicated at the time of the shooting" and was "under the influence of morphine" when he made his initial statement at the hospital. When asked if he was worried about retaliation, José responded, "of course." Upon questioning a few days later, José confirmed his original story.

### 3. Officer Heather Dorman

Officer Heather Dorman responded to a report of a gunshot on February 20, 2008. She found José lying on the ground with blood on his face and blood coming through his shirt. She asked him who shot him and he said "David" but did not know his last name.

### 4. Officer David Blair

Officer David Blair also responded to the report of a shooting. He searched for suspects and came across Martin, who was extremely intoxicated, sweaty, and had trouble standing on his own.

### 5. Officer Don Magnuson

On December 19, 2009, Officer Don Magnuson conducted a probation search at a residence where he found defendant hiding under a pile of laundry.

## B. The Defense Case

### 1. Fernando Avalos

Fernando Avalos, José's brother, was called by the defense. On the night his brother was shot he was inside the house eating dinner with his mother. He heard a gunshot and ran outside to see what was going on. He saw one man over José punching him. Fernando punched that man off

4

his brother. A second man was already down the block. The two ran away. Fernando was later taken to where Martin had been detained. He identified Martin as the person that had been on top of his brother. He denied identifying him as the shooter and disputed the statement to that effect in the police report. He said, "[Y]eah, that was him" not that that was the man who shot José. He admitted that when he ran out of the house he heard José say, "He shot me," so it was possible he thought that Martin had shot José. He had not seen the shooting.

### 2. Officer Heather Dorman

Officer Dorman was also called by the defense. She testified that prior to the field show-up Fernando reported that "Nick," was the younger brother of "David," and that David was the person who shot José.

### 3. Louis Sumaya

Louis Sumaya was present in the vicinity when José was shot. He denied seeing the shooting or any fighting. He did not recall seeing defendant at the scene.

### 4. Officer Jeffrey Caires

Officer Jeffrey Caires transported Fernando to the in-field show-up. Fernando saw Martin in the back of the police vehicle and stated, "That's him, that's the mother fucker who shot my brother." Fernando was positive the person was the same person who he saw with his brother; he did say that he sometimes got the names of the two DelReal brothers mixed up.

Caires returned to the scene and interviewed Louis Sumaya. Louis said that he had been looking down at his cell phone when he heard a shot. He looked up and saw "DelReal" and an unidentified person walk away from the scene. Louis also said that he saw DelReal put something in his pocket or down the side of his pants while he was walking away. He then saw José drop to the ground bleeding. Louis began to walk toward José when he saw DelReal turn around, look toward him, and place his hands in his pocket as if to grab something (Ans., Exh. 6 at 2–6) (footnotes omitted).

## ANALYSIS

**1.   STANDARD OF REVIEW.**

Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

5

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court, which in this action is that of the California Court of Appeal. *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). AEDPA imposes a "highly deferential" standard for evaluating state court decisions. *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. 2254(e)(1). This presumption is not altered by the fact that the finding was made by a state appellate court, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546 47 (1981).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75–76 (2003). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a [great] degree of deference to the state courts." *Clark v. Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).

Under the "unreasonable determination of the facts" clause, a state court's ruling based on a factual determination must be "'objectively unreasonable' in light of the record" to warrant habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003). "[A] state-court factual

6

1 determination is not unreasonable merely because the federal habeas court would have reached a
2 different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

3 Furthermore, even if the state court's ruling is contrary to or an unreasonable application
4 of Supreme Court precedent, that error justifies overturning the conviction only if the error had a
5 "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*
6 *Abrahamson*, 507 U.S. 619, 637 (1993).

### 2. CLAIMS FOR RELIEF.

Petitioner advances two claims for relief. *First*, he claims that his due process rights were violated because the trial court impermissibly allowed the prosecutor to allege a sentencing enhancement after the jury had been dismissed, and even if the allegation was properly alleged, the trial court did not provide petitioner with an opportunity to waive his right to a jury trial to the additional alleged enhancement. *Second*, he argues that the prosecutor committed prejudicial misconduct when he misstated the law pertaining to voluntary intoxication to the jury. This order will address each claim in turn.

### A. Sentencing Enhancement.

Although respondent argues that a Section 12022.5 enhancement is a lesser-included enhancement of Section 12022.53, petitioner argues that he was not given proper notice of the 12022.5 enhancement because it was not explicitly included in the amended information and therefore he was unable to waive his right to a jury trial (Petition at 8). In denying the objection, the trial court stated:

> As to the use of the firearm allegation, I will find that to be true pursuant to 12022.5. I find that the totality of the circumstances justifies the court making that determination, not only the facts [ad]duced at trial but the waiver, which was a knowing and intelligent waiver of the right to a jury trial by Mr. Delreal along with the bifurcation. [¶] *People v*[.] *Dixon*[, 153 Cal.App.4th 985 (2007)] supports the People's position that it's appropriate for the court to make that determination (RT 1513–14).

The State Appellate Court also rejected petitioner's argument because "the stated charge notifies the defendant, for due process purposes, that he must also be prepared to defend against any lesser offense necessarily included therein, even if the lesser offense is not expressly set forth in the indictment or information." Thus, "the facts necessary for a true finding under

section 12022.5 were necessarily alleged by virtue of the section 12022.53 allegations" (Exh. 6 at 10).

The Sixth Amendment "guarantees a criminal defendant a fundamental right to be clearly informed of the nature and the cause of the accusation against him." *Nevius v. Sumner*, 852 F.2d 463, 471 (9th Cir. 1988), *cert. denied*, 490 U.S. 1059 (1989). The principal purpose of this right is "to provide the defendant with a description of the charges against him in sufficient detail to enable him to prepare his defense." *James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994). Thus, while a court should begin its analysis by looking at the information, it may consider other sources to determine whether a defendant has fair notice of a specific charge. *Gautt v. Lewis*, 489 F.3d 993, 1003, 1009 (9th Cir. 2007). Moreover, "the charging document need not contain a citation to the specific statute at issue; the substance of the information, however, must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly." *Id.* at 1004.

While no decision from our court of appeals directly controls this action, petitioner claims that *Gautt* supports his petition. Our court of appeals in *Gautt* found that the defendant did not have fair notice when he was charged with a sentencing enhancement under Section 12022.53(b) but his sentence was later enhanced under Section 12022.53(d). *Id.* at 1008. This action, however, is clearly distinguishable from *Gautt*. The court in *Gautt* emphasized that Section 12022.53(d) has "separate and distinct elements, not required for conviction under section 12022.53(b)." In particular, Section 12022.53(b)'s defining element is that a defendant "personally used a firearm." Section 12022.53(d), in contrast, applies only if a defendant "intentionally and personally discharged a firearm and proximately caused great bodily injury." *Id.* at 1006–07. Thus, the defendant was not provided fair notice of a Section 12022.53(d) enhancement when the information only alleged a Section 12022.53(b) enhancement because "the words 'personally used' do not subsume section 12022.53(d)'s 'personal[] discharge[]' element, since Gautt could have 'personally used' his handgun without ever firing it." *Id.* at 1007.

8

1    In this action, the Section 12022.53(b)–(d) enhancements charged in the amended
2 information "subsume" the Section 12022.5 enhancement because the latter is a lesser-included
3 enhancement to the former enhancements, as recognized by the California Court of Appeal (Exh.
4 6 at 10) (citing *People v. Dixon*, 153 Cal.App.4th 985, 1001–02 (2007)).  For example, Section
5 12022.53(b) applies to "any person who, in the commission of a [specified] felony . . . ,
6 personally uses a firearm . . . ."  Likewise, Section 12022.5 applies to any person who
7 "personally uses a firearm" in the commission of a felony or attempted felony.  It has no
8 additional elements, so petitioner would not have to prepare any defense other than the one he
9 did to rebut the Section 12022.53(b)–(d) enhancement allegations.  Thus, defendant was
10 provided fair notice of the Section 12022.5 enhancement allegation.  Other judges in this circuit
11 have found similarly.  *See Williams v. Carey*, 2007 U.S. Dist. LEXIS 80868, at *50 (N.D. Cal.
12 Oct. 23, 2007) (Judge Marilyn Hall Patel); *Miani v. Ollison*, 2007 U.S. Dist. LEXIS 17787, at
13 *10–11 (S.D. Cal. Mar. 12, 2007) (Judge Anthony Battaglia); *Maestaz v. Lopez*, 2012 U.S. Dist.
14 LEXIS 185129, at *28–31 (C.D. Cal. Oct. 25, 2012) (Judge Jacqueline Chooljian).

15    Petitioner's second argument is that his Sixth Amendment rights were violated because
16 he did not have the opportunity to waive his right to a jury trial as to the Section 12022.5
17 enhancement allegation (Petition at 8).  The Supreme Court has held, "[o]ther than the fact of a
18 prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory
19 maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi v.*
20 *New Jersey*, 530 U.S. 466, 490 (2000).  However, "nothing prevents a defendant from waiving
21 his *Apprendi* rights.  When a defendant pleads guilty, the State is free to seek judicial sentence
22 enhancements so long as the defendant either stipulates to the relevant facts or consents to
23 judicial factfinding."  *Blakely v. Washington*, 542 U.S. 296, 310 (2004).  Here, petitioner
24 explicitly waived his right to a jury trial as to the Section 12022.5 enhancement allegation and
25 consented to judicial factfinding.  At the pretrial hearing where petitioner moved to bifurcate the
26 sentencing enhancements, the trial court judge asked him, "Mr. Del Real, you have the right to a
27 trial on the special allegations before a jury or a judge.  Do you understand that?"  Petitioner
28 responded, "Yes, I do."  The judge then stated:

9

> And we are talking about the special allegations, not the trial here now, the allegations are that you personally intentionally discharged a firearm and resulting in great bodily injury, that you used a firearm and that the -- that you committed, inflicted great bodily injury on the victim
> . . .
> Do you agree to allow the court to determine [the sentencing enhancements] after the trial is over based on the evidence at trial?

After conferring with his counsel, petitioner responded, "Yeah" (RT 270–72). This order notes that the trial court judge never referenced any particular section of the California Penal Code when explaining petitioner's right to a jury trial. Rather, the judge plainly stated that petitioner would be agreeing to waive his right to a jury trial on the sentencing enhancement that "[he] used a firearm . . . ." The judge's explanation of the sentencing enhancements encompass both 12022.53, which was alleged in the amended information, and 12022.5 because the latter is a lesser-included enhancement of the former. *People v. Dixon*, 153 Cal.App.4th 985 (2007). Thus, petitioner knowingly and intelligently waived his right to a jury trial on a Section 12022.5 sentencing enhancement. *See Gautt*, 489 F.3d at 1004. Moreover, petitioner makes no attempt to show that his waiver was based on deficient advice of counsel. This reason, in addition to the fact that petitioner knew that the prosecutor would present evidence that he used a firearm, explains why there is no prejudice. *Brecht*, 507 U.S. at 637; *see also Hamblin v. Barnes*, 2012 U.S. Dist. LEXIS 32880, at *7–8 (E.D. Cal. Mar. 12, 2012) (Judge Charlene Sorrentino). Accordingly, the State Appellate Court's rejection of petitioner's claims regarding the Section 12202.5 sentencing enhancement was not contrary to, or an objectively unreasonable application of, any clearly established decision by the Supreme Court and its analysis did not involve an unreasonable determination of the facts.

### B. Prosecutorial Misconduct.

Petitioner also argues that his right to a fair jury trial was undermined when the prosecutor allegedly committed prejudicial misconduct by misstating the law pertaining to voluntary intoxication to the jury:

> Defendant had to be so intoxicated he did not know what he was doing when he pointed the gun to the victim and pulled the trigger. He had to be so drunk that he didn't realize, gee, if I point this gun and I shoot it I'm not going to kill this guy. The other thing you need to remember is the issue of

10

> intoxication only comes into your thinking, your decision making with respect to the crime of attempted murder.
>
> Was there intent to kill and was there deliberation and premeditation only? That means you can look and say, yeah, he had some drinks--I will talk to you more about that later because he wasn't that drunk, but you can look at that and deliberate that on those issues only (RT 1028–29).

In other words, petitioner argues that the prosecutor misled the jury by telling them that it could consider intoxication only with respect to the intent necessary for murder and that it was not considered in connection with the lesser-included offense of voluntary manslaughter (Petition at 8). Petitioner's trial counsel objected to the prosecutor's definition of voluntary intoxication at trial, but the trial court overruled the objection (RT 1029).

The California Appellate Court rejected petitioner's argument, stating:

> A close reading of the prosecutor's argument indicates that there was no clear misstatement of the law. The alleged misstatement was made in the context of the prosecutor's discussion of the crime of attempted murder. He noted that the issue of intoxication "only comes into your thinking, your decision making with respect to the crime of attempted murder. [¶] Was there intent to kill and was there deliberation and premeditation only?" The statement could be read two ways: that intoxication is relevant only to the crime of attempted murder or that intoxication relates only to the elements of intent and deliberation. The latter reading is supported by the very next comment the prosecutor made: "Once you got that intent to kill, as far as that part of it's done, you can't say, well, he was really drunk and so if I--if someone was that drunk they might have been that passionate because they really didn't know what was going on. Doesn't matter, it's a reasonable person only. Alcohol doesn't come in." That is, the argument was that intoxication plays no role "[o]nce you got that intent to kill." Thus, the argument does not disclose a patent misstatement of the law. At worst, the argument is ambiguous. For the reasons that follow, any ambiguity was harmless.
>
> The voluntary intoxication instruction was supported by the slimmest of evidence. The only evidence that defendant was intoxicated was José's use of the plural pronoun. Furthermore, the defense did not turn upon defendant's state of mind. Defendant's theory was that he was not the shooter. In his argument to the jury, defense counsel focused upon inconsistencies between José's trial testimony and reports he made after the shooting, in an effort to show that Martin, not defendant, was the shooter. His only mention of voluntary intoxication came toward the end of his argument, when he told the jury, "And it's true by law we have to give, whenever there is a serious crime, lesser crime and defenses with supporting evidence. If some of you--if some of you say, you know what, I don't care what [defense counsel] says, he pulled that trigger, somebody say [sic] that you still have to go down that line of involuntary intoxication--voluntary intoxication and imperfect self-defense." Counsel concluded, "But I am confident at the end of this deliberation every one of you is going to say we just didn't have enough, that it is not guilty, that

11

1
2
3
4
5
6
7
8

> you just didn't give us the information to prove that [defendant] did the shooting."
>
> And finally, there is no dispute that the trial court properly instructed the jury in the elements of attempted murder, attempted voluntary manslaughter, and voluntary intoxication. The trial court also instructed the jury to follow the instructions and the law as the court explained it. If counsel's description of the law was different, the jury was to ignore it. We presume the jury followed the instructions it was given. (*People v. Cain* (1995) 10 Cal.4th 1, 34.) In light of all this, and applying the more stringent federal test (*Chapman v. California* (1967) 386 U.S. 18, 24), we are convinced beyond a reasonable doubt that, absent the ambiguity in the prosecutor's argument, the jury would nevertheless have reached the same result (Ans., Exh. 6, at 7–9).

This order agrees. A prosecutor's objectionable statements during closing arguments warrants habeas relief only if they "so [infect] the trial with unfairness as to make the resulting conviction a denial of due process." Because the standard of review on federal habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power," even an improper statement of the law does not necessarily violate a defendant's constitutional rights. *Darden v. Wainwright*, 477 U.S. 168, 179–181 (1986). As the State Appellate Court held, the prosecutor's statement could be read to mean that intoxication relates only to the elements of intent and deliberation, which was a correct statement of the law. "A court should not lightly infer that a prosecutor intended an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).

Even assuming, *arguendo*, that the prosecutor committed misconduct by making an incorrect statement about the law of involuntary intoxication, the error was harmless in this action because the trial court properly instructed the jury on attempted first-degree murder and attempted voluntary manslaughter, including the intent-to-kill element (RT 1018–24). *Brecht*, 507 U.S. at 637. With regard to voluntary intoxication, the trial court instructed the jury that voluntarily intoxication could negate the intent to kill necessary to a conviction of attempted murder or attempted voluntary manslaughter:

> You may consider evidence[,] if any[,] of the defendant's voluntary intoxication, only in a limited way, you may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation.

12

> A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose (RT 1023–24).

The trial court also instructed the jury that if it believed that counsel's comments on the law conflicted with the court's instructions, then it was required to follow the court's instructions (RT 1004). Absent evidence to the contrary, the jury is presumed to follow its instructions by the court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). The State Appellate Court also found harmless error because petitioner presented minimal evidence that he was intoxicated at the time of the incident (Ans., Exh. 6, at 7–9). In his habeas petition, petitioner cannot merely disagree with the California Appellate Court's determination of the facts by arguing that "it is reasonable to conclude . . ." the opposite (Petition at 16). Where "reasonable minds reviewing the record might disagree," on habeas review "that does not suffice to supersede" a factual finding by the State Appellate Court. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). Thus, the State Appellate Court's ruling was not contrary to, nor an unreasonable application of, clearly established United States Supreme Court precedent and its analysis did not involve an unreasonable determination of the facts. Petitioner is not entitled to habeas relief based on his claim of prosecutorial misconduct.

## CONCLUSION

The petition for a writ of habeas corpus is **DENIED**. Judgment will be entered in favor of respondent and against petitioner. A certificate of appealability will not be issued. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). **THE CLERK SHALL CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated: February 11, 2014.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13